UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERESA M. ANDERSON,<br><br>Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, Acting Commissioner of Social Security,<br><br>Defendant. | Case No. 1:12-CV-813-SMS<br><br>ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br><br>ORDER REMANDING PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(g)<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF AND AGAINST DEFENDANT |

Plaintiff Teresa M. Anderson, by her attorney Young Chul Cho, seeks review of the final decision of the Commissioner of Social Security ("Commissioner") that she is not entitled to benefits under the Social Security Act ("the Act"). Both parties consented to magistrate jurisdiction. Docs. 11 & 13. The matter is before the Court on the parties' cross-briefs, which were submitted without oral argument. For the reasons below, Defendant's motion for summary judgment is **DENIED,** and the matter is **REMANDED** for further proceedings.

**I.     Procedural History**

Plaintiff previously applied for Title II benefits in May 2006, as well as for Title XVI benefits on a date that is unclear from the record. AR 172-74. In July or August 2006, these claims were denied on the grounds that Plaintiff had been disabled, but her disability had not lasted 12 months. AR 173, 489-90. In January 2007, her claims were denied on reconsideration. *Id*.

Plaintiff applied again in April 2008. (Title II benefits are retroactive for twelve months. Title XVI benefits are not retroactive. 20 C.F.R. §§ 404.621(a)(1), 416.335.) The agency denied benefits,

1

initially in July 2008 and on reconsideration in December 2008. Plaintiff requested a hearing, and testified on July 9, 2010 before Sally C. Reason, administrative law judge ("ALJ"). On October 21, 2010, the ALJ denied her application. The Appeals Council denied review on March 13, 2012. Plaintiff appealed.

**II.     Factual Record**

    **A.     Medical History**

        **1.     Evidence Prior to MRI of September 2007**

Plaintiff was born in 1979 and was 31 years old at the hearing. She had a high school education and worked as a high school security guard for four years, beginning in September 2001. Before that, she continuously reported earnings since age 18. AR 187.

Plaintiff hurt her back on January 12, 2005 while breaking up a fight at the high school. AR 253, 278. Two days later she was referred to the employer-selected physician, William Marshall, D.O., at the Bakersfield Occupational Medical Center. He took x-rays and diagnosed lumbar and sacroiliac strain. Initial treatment included anti-inflammatories, which caused upset stomach, and limited physical therapy, which also apparently did not help. AR 253, 273, 278, 507.

After two months of pain and discomfort and a continued inability to return to work, she was referred to a specialist. Between April and November 2005, she saw Steven Schopler, M.D., an orthopedist at Southern California Orthopedic. In May 2005, an MRI of the lumbar spine was unremarkable except for a "small dorsal disc protrusion at L5-S1 with no significant resulting stenosis."[1] AR 255. Based on x-rays and the MRI, he diagnosed lumbar sprain and a small (3mm) central disc protrusion at L5-S1. He noted that Plaintiff was not a surgical candidate at that time but could benefit from a lumbar epidural steroid injection. AR 508. Physical therapy yielded a "mild improvement" in pain. AR 298, 302. In July 2005, he wrote that Plaintiff's condition was permanent and stationary with "maximum lifting of 25 pounds" and "no repetitive bending, lifting, stooping, or twisting." AR 293. She did not benefit from "extensive" physical therapy. She "appears to amplify

---

[1] In July 2009, Plaintiff's treating orthopedist Dr. Gil Tepper was shown these MRI findings. He noted that this MRI showed "vastly different levels of pathology" than an MRI that he ordered in September 2007. However, because he did not have access to the original films, he reserved judgment as to whether this was a result of the earlier MRI being under-read, the second MRI being over-read, or intervening deterioration. AR 550-54.

2

her symptoms above and beyond what her diagnostic studies indicate." Surgery was unnecessary, but pain management or epidural injections were an option. In November 2005, Plaintiff told Dr. Schopler that she had sought a second opinion. AR 290. This was from Joel Mack, M.D., an orthopedic surgeon whom she first saw in June 2005. In June 2005, Dr. Mack reviewed x-rays, but not the MRI, and diagnosed chronic lumbosacral strain.

In August 2005, the Division of Workers' Compensation requested a comprehensive medical-legal evaluation. Dr. Clement O. Alade, M.D., performed a record review, an orthopedic exam, and additional testing. AR 271-88. Nerve conduction studies were abnormal and consistent with a right S1 radiculopathy. A computerized study of spinal movement suggested submaximal effort. Her gait was antalgic, and she had difficulty with heel and toe walking, squatting, kneeling, and bending. Dr. Alade diagnosed a lumbar spine strain. Pain medication was not necessary except for anti-inflammatories and epidural injections. Plaintiff's disability was "equivalent to disability precluding very heavy lifting." She was permanent and stationary with a 5 percent "total whole person" impairment. She could return to her prior job with modified duties including lifting and carrying no more than 50 pounds and occasional twisting, kneeling, pushing, pulling, and crawling.

In February 2006, Plaintiff saw Thomas Gable, D.O., at Bakersfield Occupational Medical Center. He noted back pain, diagnosed chronic sciatica, and recommended pain management and epidural injections. AR 310. In July 2006, Plaintiff complained of low back pain with radiculopathy into the right lower extremity. Dr. Gable diagnosed lumbar spine pain and improved sciatica, and recommended medication and pain management. She could return to work with modifications. Specifically, she had a limited capacity to lift, push, pull 25 pounds, bend, twist, stoop, kneel, squat, and stand. She could not climb, run, or engage in repetitive or prolonged walking. AR 312. (Plaintiff states that she did not return to work because her employer did not have positions with those modifications. AR 510.)

Plaintiff continued treatment with Dr. Mack. In September 2006, he diagnosed chronic low back strain plus deconditioning. AR 362-64. Despite epidurals and some physical therapy, she "has not improved one bit." AR 351-53, 551, 360. In October 2006, he opined that she had not previously been prescribed "the kind of spinal stability and strengthening exercises that I would have ordered

with her." He added a diagnosis "at least partially" of deconditioning, and prescribed two weeks of conditioning exercises and core stabilizing exercises. She was "certainly" not a candidate for surgery or strong opiate analgesics. AR 361.

By January 2007, the request for physical therapy had not been authorized. AR 360. In February 2007, after undergoing physical therapy, Plaintiff reported no improvement in pain. Dr. Mack acknowledged, "I have reviewed her records and re-examined her today and explained to her that at this point I am at a loss to account for her continued pain and disability." *Id*. He recommended that she seek a second opinion. In April 2007, her pain had gotten worse, particularly in the right iliolumbar region. Dr. Mack tried trigger point injections. Plaintiff reported some benefit from Vicodin, which she said she was borrowing from her husband. In July 2007, Dr. Mack expressed to Plaintiff that he had "exhausted my diagnostic and therapeutic capabilities" and could "do no more for you," and recommended she get a second opinion. Meanwhile, he would be happy to continue treating her and providing her with medication. AR 355.

## 2. Treatment with Dr. Tepper before His March 2009 Permanent and Stationary Report

In August 2007, Plaintiff began treatment with orthopedic surgeon Gil Tepper, M.D., who obtained a new MRI in September. The disc bulge at L5-S1 was now 10 millimeters and was causing a "moderately significant" degree of central stenosis. AR 402, 470. Based on the new MRI, Dr. Tepper diagnosed herniation, degenerative disc disease, and stenosis at L5-S1, as well as bilateral lower extremity radiculitis. AR 470-71. He recommended lumbar spine fusion surgery. *Id*. (When Dr. Mack reviewed the new MRIs, he acknowledged that the bulging disc had increased in magnitude, and concurred with Dr. Tepper that disc excision with instrumented fusion was appropriate. AR 354.) In October, while awaiting approval from workers' compensation for the fusion surgery, Dr. Tepper also recommended a chiropractic rehabilitation program. AR 465. In November 2007, the request for a chiropractor was denied because "the patient should be able to perform her exercises independently at this time." AR 418-422. In December 2007, Dr. Tepper renewed his request for surgery, noting that the x-rays and MRI showed L5-S1 disc height collapse, spondylosis, internal disc disruption, and herniation at L5-S1. AR 459.

4

Authorization for the surgery was obtained in December 2007, after the Division of Workers' Compensation obtained the opinions of two orthopedic reviewers. The first reviewer recommended against the procedure. While he acknowledged the "significant disc protrusion" at 10mm causing "some degree" of central stenosis, and while he believed a discectomy might be warranted, he deferred to guidelines that only recommend fusion in more severe cases such as fracture, dislocation, or infection. AR 365-68. A second reviewer recommended the procedure. He felt that "there has been therapy and appropriate workup" based on "documentation from Dr. Tepper of significant range of motion loss, with an internal disc disruption, right lower extremity radiculitis and radiculopathy from a 2005 injury." AR 369-76.

The surgery occurred on January 9, 2008. AR 382. Plaintiff was discharged with a prescription for Norco and Soma, along with her existing prescriptions for Vicodin and Ultram. AR 379-80. Two weeks later (January 2008) the incision was "well-healed." Plaintiff complained of back soreness. Dr. Tepper diagnosed "status post 360 fusion L5-S1." AR 455. (This would remain his diagnosis for the remainder of treatment.) In February 2008, Plaintiff continued to feel soreness in the lumbar spine, occasionally radiating into her right leg. The pain made it hard to sleep. Range of motion was not tested due to the recent surgery, but straight leg raising was negative, and lower extremities showed 5/5 motor strength. (This finding appears in every subsequent progress note.) Dr. Tepper recommended a bone stimulator. AR 451-54. In March 2008, Plaintiff continued to describe aching in her lumbar spine and pain that occasionally radiated into her leg. However, she acknowledged a 50 percent reduction in pain in the eight weeks since her surgery, and benefited from the pain medication. AR 448-50. In April 2008, Plaintiff continued to complain of radiating back pain with a 20 to 25 percent improvement in back symptoms since her surgery. Dr. Tepper renewed his previous recommendation for a chiropractic rehabilitation program. AR 445-47. A CT scan revealed "satisfactory spinal fusion surgery at L5-S1." It also revealed 2 millimeter retrolisthesis of L4-S1 and L4-L5, right and left facet arthropathy at both levels, and a 2 to 3 millimeter disc protrusion at L4-L5. AR 404-09. Later in April 2008, the request for a bone stimulator was denied, in part due to a lack of recent medical imaging; the reviewer was unaware of

the April CT scan. AR 411-17. Also, in May 2008, the chiropractor was again denied, because spinal manipulation was contraindicated given the recent surgery. AR 423-26.

In May 2008, Plaintiff continued to complain of "frequent and moderate" lumbar pain, radiating into both legs, worse in the left. Dr. Tepper again requested physical therapy, which had not yet been approved, and renewed her Ultram and Vicodin. AR 442-44. In June 2008, Plaintiff complained of shooting pain in her legs. Dr. Tepper renewed his request for physical therapy. In addition to Ultram and Vicodin, he prescribed various analgesic creams. AR 439-41. In July 2008, Plaintiff continued to have lumbar pain, with a 25 percent overall improvement since the surgery. In August 2008, physical therapy was authorized. AR 431-35. However, the analgesic creams were retroactively denied because there was no showing why oral anti-inflammatories and painkillers were insufficient. AR 492-98. In September 2008, Plaintiff had tenderness in the right hypertonic lumbar spine. Dr. Tepper prescribed an additional month of physical therapy. AR 427-30. That month, Plaintiff's physical therapist noted that she reported less serious and less frequent lower extremity symptoms. Her lumbar range of motion was within 80 percent of normal, though she still had painful forward bending and stiffness. AR 499.

In July 2008, Dr. A. Khong, a non-examining state agency physician, examined Plaintiff's records. In light of the prior denial, he started his assessment in January 2007. AR 483. He noted that Plaintiff's diagnosis was now more serious than it had been when Plaintiff's previous application had previously been denied. Taking into account her motor range, her straight leg raising tests, and her pain, Dr. Khong opined that Plaintiff had become unable to work after her surgery in January 2008, but he expected that she would regain the capacity for light work before January 2009. AR 483, 490; *see* AR 172. On reconsideration, Dr. De La Rosa affirmed Dr. Khong's projection. He found Plaintiff "partially credible," noting that objective findings were limited to a decreased range of motion in her back, with good motor strength and no radiculopathy. AR 108, 502; *see* AR 172.[2]

In October 2008, Plaintiff's lumbar pain was moderate and intermittent, with right leg numbness that increased at night and was exacerbated by prolonged driving and activity. Dr. Tepper

---

[2] There is some suggestion that Dr. De La Rosa was not given Dr. Tepper's latest progress notes. AR 22, 108, 149. However, Dr. De La Rosa appears to have consulted some of these notes. AR 501.

6

requested more physical therapy. AR 579-81. His November 2008 progress note was similar. AR 577-78. In December 2008, findings were similar, except that Plaintiff's symptoms improved 50 percent since the last month, and Dr. Tepper responded by refilling her Vicodin prescription with half as many pills. AR 574-76. In January 2009, objective findings were roughly unchanged, except that she described numbness episodes in her right leg. Plaintiff claimed a 50 percent improvement in her symptoms. Dr. Tepper took x-rays and prescribed an at-home electric stimulation unit. AR 572-73. On March 3, 2009, Plaintiff complained of "constant" lumbar pain and "occasional" pain in both legs. AR 570-71. On March 31, 2009, an MRI revealed a 2 millimeter disc bulge at L4-L5 with bilateral paracentral extension abutting both L5 nerve roots and neural foramina. There was mild spinal stenosis and hypertrophy to the facet joints and to the ligamentum flavum. AR 517, 569.

In each of the above progress reports, from August 2007 through March 3, 2009, Dr. Tepper instructed Plaintiff to remain on "temporary total disability" for the next four weeks.

### 3. Evidence Subsequent to Permanent and Stationary Report of March 2009

On March 31, 2009, Dr. Tepper issued his permanent and stationary report. AR 558-67. Plaintiff had persistent lumbar pain with numbness and tingling to the buttocks. Her pain increased with standing, walking, and sitting for ten minutes. She had difficulty with forward flexion, extension, and twisting. The pain gave her trouble sleeping. She was no longer attending physical therapy, as her allowed visits had been exhausted; she had also stopped using the electrical stimulator because she developed discoloration around the incision site. Dr. Tepper opined that Plaintiff was permanent and stationary, and could lift up to 15 pounds with no repeated bending and stooping. The objective basis for this assessment was her status post surgery, the MRIs, and her decreased range of motion. He recommended a 23 percent whole person impairment due to the surgical fusion, plus 2 percent for Plaintiff's excess pain and 3 percent for her consequent use of pain medication. She could not return to her usual and customary employment. In all subsequent progress reports, Dr. Tepper described Plaintiff's work status as "permanent partial disability." In July 2009, he wrote a supplemental report with no significant new conclusions. AR 550-54.

In April 2009, objective and subjective findings showed no major changes. AR 555-57. At the next exam in July 2009, Plaintiff reported doing home strengthening and stretching exercises.

AR 547-49. At the next exam in October 2009, Plaintiff described "flare ups" since the previous month in the lumbar spine. Dr. Tepper prescribed a seat cushion. AR 544-46. Records are missing for visits between October 2009 and January 2010. At the next examination in March 2010, Plaintiff continued to complain of pain made worse with prolonged sitting. It was moderate and constant, but frequently became severe, radiating to the right knee, causing nausea and vomiting, and interfering with her sleep. At the same time, she reported doing home strengthening and stretching exercises as previously recommended, and her range of lumbar motion showed significant improvement. AR 542-44. There are no further records from Dr. Tepper.

In August 2009, Plaintiff saw orthopedist Steven Silbart for an Agreed Medical Examination as part of her workers' compensation case. AR 505-38. She continued to complain of pain and physical limitation, although the radiating pain in her legs had subsided considerably beginning in March 2009. She was currently taking Darvocet and Vicodin. Her range of motion was considerably inferior to what Dr. Tepper had measured the previous month. *Compare* AR 521 *with* AR 547. Dr. Silbart concurred with Dr. Tepper that Plaintiff became permanent and stationary in approximately March 2009, and that she was totally temporarily disabled prior to that date. She had a 23 percent impairment following her spinal surgery and a 3 percent impairment due to pain. She was not capable of resuming her usual and customary work duties.

On August 31, 2010, Plaintiff attended a post-hearing orthopedic consultative evaluation with Fariba Vesali, M.D., a consultative orthopedist. AR 584-93. Plaintiff reported "constant low back pain" aggravated by sitting or standing more than 5-10 minutes. Based on the physical exam, Dr. Vesali assessed Plaintiff's residual functional capacity (RFC) to include the ability to lift and/or carry 11-20 pounds frequently, 21-50 occasionally; to sit, stand, and/or walk two hours at a time without interruption, six in an eight-hour day; and to frequently perform all postural activities. *Id*.

### B.     Plaintiff's Description of Her Symptoms and Limitations

Plaintiff described her limitations and daily activities in her testimony from 2010 and in disability and pain questionnaires from May 2008. These two descriptions were consistent. She said she could not work due to lumbar strain and pain which prevented lifting, standing, bending, or sitting for long periods. Prior to her fusion surgery in January 2008, the pain was a "pressure type

8

pain." After the surgery, this pain was replaced with an "aching, pulling-type pain that goes through my hips into my lower back." Her lower back "stays really tight all the time, and is very tender, just to the touch." In the questionnaires from 2008, she characterized the pain as a "constant pressure [and] stabbing pain" in her lower back, which would worsen when she remained in one position for any length of time. Physical therapy seemed to help, but she sometimes had trouble getting it approved. She also testified that her legs would go to sleep, and every once in a while her right leg would experience a sharp pain and tingling.

Plaintiff could walk only "very short" distances, stand for 10 minutes, and sit for 10 to 15 minutes (in her testimony, 30 minutes allowing for adjustments to accommodate her pain). Walking too far would cause "severe pain, especially through my lower back and right hip." According to the 2008 questionnaires, she took Vicodin and Ultram, several times daily for more than a year, which "slightly alleviates the pain about 1 hour." The medicines caused drowsiness and upset stomach. According her 2010 testimony, she took Vicodin and Tylenol (extra strength, 500 mg). She did not say whether Vicodin helped, but the side effects prevented her from going out in public. At one point after her surgery, her doctors temporarily replaced Vicodin with Darvocet and Soma. However, she went back to Vicodin because she did not like the feeling that Soma gave her, and the Darvocet "didn't really help with the pain."

Her daily activities included walking through the house, doing dishes, folding laundry, talking on the phone, watching TV, and resting. Pain made it harder to work, sleep, clean the house, hunt, go to sporting events, assist in junior sports, attend spectator sports, and brush her hair. Trips to the market were short because she could not walk long. She could not push a shopping cart because that "causes the pain to flare up." ("If I do use the shopping cart," this was "more as a walker as opposed to … standing upright and pushing it.") She lived with her boyfriend, who would take care of meals, do laundry, drive her places, and "things like that." There was one step into their home and he would help her with that step. She would spend an average day at home, watching movies, but not sitting for long. Due to the pain, she felt that she did not have a life anymore.

At the post-hearing orthopedic consultative exam on August 31, 2010 with Dr. Vesali, Plaintiff complained of a constant, pressure-like low back pain with radiation to the right knee.

1  Sitting or standing more than 5-10 minutes aggravated it. Lying down and pain medicine helped. She
2  rarely drove or sewed (her hobby), and did not grocery shop, cook, or do household chores.

3        On September 21, 2011, Plaintiff wrote a letter to the Appeals Board. She stated that, since
4  filing her appeal, she saw doctors every six weeks and took extra-strength Vicodin and used a TENS
5  unit daily. She had begun a round of epidurals. Her pain level prevented her from getting out of bed
6  two to four days a week. She enclosed the results of a new MRI.

### C. Testimony of Vocational Expert

Ronald Hatakeyama, Ph.D., testified as the vocational expert. He stated that Plaintiff had a work history of security guard (light, 3).[3] He then assumed a person of Plaintiff's age (31), education (high school), and work history, and considered hypothetical scenarios involving this person's RFC. *Cf.* 20 C.F.R. §404.1560(c)(1).

In the first hypothetical, posed by the ALJ, the person could lift 15 pounds occasionally; could occasionally bend and stoop; must have minimal pushing or pulling or other forceful or taxing situations; and must change positions every 30 minutes to relieve discomfort. Mr. Hatakeyama stated that the person could not perform Plaintiff's past work, but could do representative occupations such as information clerk (sedentary, 2—5,000 jobs regionally, 200,000 nationally) and surveillance system monitor (sedentary, 2—1,000 jobs regionally, 55,000 nationally).

In the second hypothetical, posed by Plaintiff's attorney, the person could stand and sit for 20 minutes at a time and could not concentrate at all. Mr. Hatakeyama stated the person could not work.

### III. The ALJ's Decision

The ALJ found that Plaintiff had not met her burden under the Act to show that she was disabled. Pursuant to 42 U.S.C. § 1382c(a)(3)(A), to be disabled, a claimant must be unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of at least twelve months. The ALJ followed the five-step sequential analysis in 20 C.F.R. §§ 404.1520 (a)-(f):

---

[3] The job title is followed by a strength rating and a Specific Vocational Preparation number in parentheses. The strength rating captures the physical demands and frequency of certain basic activities. The frequency may be "never," "occasional" (up to one-third of the workday), "frequent" (from one-third to two-thirds), or "constant" (two-thirds or more). The Specific Vocational Preparation ranks, from one to nine, the time required to learn facility in the job. *See* Dictionary of Occupational Titles (4th ed.1991) Appendix C.

| | | |
|---|---|---|
| Step one: | Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two. | |
| Step two: | Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate. | |
| Step three: | Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is automatically determined disabled. If not, proceed to step four. | |
| Step four: | Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five. | |
| Step five: | Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled. | |

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995). Plaintiff had not worked since January 14, 2005. She had degenerative disc disease and status-post 360-degree fusion and decompression surgery at L5-S1. She was not disabled under a listing. Her RFC corresponded to Mr. Hatakeyama's first hypothetical: she could not do her past work but could do other work. She was not disabled.

## IV. Discussion

### A. Scope of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. This Court must uphold the decision if the ALJ applied the proper legal standards and made findings supported by substantial evidence. *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla," *id.*, but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975). The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985). If the evidence can reasonably support either affirming or reversing the Secretary's conclusion, the Court may not substitute its judgment. *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir.1996).

### B.  The ALJ Erred by Not Considering Dr. Tepper's Opinions Which Supported a Closed Period of Disability

Dr. Tepper's opinions evolved over the course of treatment. In his March 31, 2009 permanent and stationary report, he opined that Plaintiff was "permanently partially disabled," with an RFC of roughly sedentary work. The ALJ relied upon this opinion in finding Plaintiff not disabled. However, prior to issuing this report, Dr. Tepper repeatedly opined that Plaintiff was "temporarily totally disabled." According to every progress note from August 2007 through March 2009, "[t]he patient has been instructed to remain on temporary total disability for 4 weeks."

Dr. Tepper was a treating physician. To reject his uncontroverted opinion, the ALJ had to articulate clear and convincing reasons supported by substantial evidence; to reject his controverted opinion, the ALJ only needed to show specific and legitimate reasons supported by substantial evidence. *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996). But regardless of whether Dr. Tepper's opinion was controverted or uncontroverted, the ALJ at the very least had to *consider* it. SSR 96-8p; *see Lingenfelter v. Astrue*, 504 F.3d 1028, 1038, n. 10 (9th Cir. 2007) (ALJ cannot avoid the treating physician requirements "simply by not mentioning the treating physician's opinion and making findings contrary to it."). Here, Plaintiff argues, and Defendant does not disagree, that the ALJ failed to discuss this opinion. The question, then, is whether this error was harmless. Plaintiff argues that if the ALJ had considered this opinion, she might have found Plaintiff disabled between August 2007 and March 2009 and eligible for a "closed period" of disability benefits.[4]

Defendant disagrees. She argues that this statement should not be viewed as an opinion regarding Plaintiff's degree of disability, because the term "temporary total disability," a term of art in the California Workers' Compensation System, "focuses on whether, if ever, an injured worker can return to the *same job* he or she performed on the date of their workplace injury." Defendant's Brief at 5. This is incorrect. The term means that an individual is "totally incapacitated" and "unable to earn any income during the period when he is recovering from the effects of the injury." *Booth v.*

---

[4] To obtain a closed period of disability the evidence must show that: 1) the claimant could not engage in substantial gainful activity for a continuous period of 12 months, 2) the disability ceased by the time of adjudication, and 3) the claimant met all other eligibility requirements for \benefits. *See Moore v. Commissioner of Social Security Administration,* 278 F.3d 920, 924 (9th Cir.2002) (recognizing the SSA regulations provide disability benefits may be awarded for a closed period lasting at least 12 months even after claimant returns to work).

1 *Barnhart*, 181 F.Supp.2d 1099, 1103 n.2 (C.D. Cal. 2002). The ALJ was not privileged to disregard
2 this opinion "simply because it was initially elicited in a state workers' compensation proceeding, or
3 because it is couched in the terminology used in such proceedings." *Id*. at 1105. Because this was an
4 opinion as to the ultimate issue of disability, it was not binding on the ALJ; nevertheless, she could
5 not reject it without explaining why she did so, just as she would have to do for any of his other
6 medical opinions. *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).

7 This is "especially" true where the worker's compensation opinion is that the claimant is
8 disabled. *Holmes v. Astrue*, ED CV 10-1206-PLA, 2011 WL 2837698 (C.D. Cal. July 15, 2011)
9 (remanding for reconsideration of closed period of disability where ALJ failed to consider
10 physician's opinion that Plaintiff's lumbar spine impairment rendered him "temporarily totally
11 disabled"). In general, it is true that the categories of work under Social Security disability schemes
12 are measured "quite differently" from California's workers' compensation claims. *Desrosiers v.*
13 *Sec'y of Health & Human Servs.,* 846 F.2d 573, 576 (9th Cir.1988). For example, in *Desrosiers*, one
14 doctor found the claimant incapable of "light" work as defined by Social Security, while two other
15 doctors found him capable of "heavy" work as defined by California Workers' Compensation. But
16 unlike in *Desrosiers*, where the ALJ failed to look beneath these similar-looking labels to see that
17 the terms had different meanings, here the phrase "temporary total disability" means exactly what it
18 looks like: "unable to earn any income." This definition is indistinguishable from the "substantial
19 gainful employment" requirement of Social Security, and after 12 months, it means "disabled."

20 Defendant also points to other physicians who contradicted Dr. Tepper, and concludes that it
21 would be "illogical" to find someone disabled given the limitations that these physicians described.
22 Regardless of what Defendant might find logical, the Court may not accept post hoc explanations,
23 *Barbato v. Commissioner of Social Sec. Admin.*, 923 F.Supp. 1273, 1276, n. 2 (C.D.Cal. 1996), and
24 it may not speculate as to the ALJ's findings or the basis of the ALJ's unexplained conclusions,
25 *Lewin v. Schweiker*, 654 F.2d 631, 634-35 (9th Cir. 1981).

26 **C.     The ALJ Properly Rejected Plaintiff's Symptom Testimony**

27 Plaintiff alleged severe pain in her lower back and right hip region. Plaintiff argues that the
28 ALJ gave insufficient reasons for rejecting this testimony. The Court disagrees.

An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional requirement. *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), *quoting Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). Absent affirmative evidence of malingering, and assuming impairments that could reasonably give rise to the reported symptoms, the ALJ must assess the credibility of the complaints. *See* 20 CFR 404.1529(c); *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006). Factors to consider include the claimant's daily activities; the location, duration, frequency, and intensity of the symptoms; precipitating or aggravating factors; and measures taken to alleviate the symptoms—including medication (type, dosage, effectiveness, and side effects), other medical treatment, and non-medical measures such as lying down or changing positions. *Id*. An ALJ may also consider ordinary techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid. *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008). If the ALJ decides to reject a claimant's testimony after a medical impairment has been established, the ALJ must make specific findings assessing the credibility of the claimant's subjective complaints. *Ceguerra v. Secretary of Health and Human Services*, 933 F.2d 735, 738 (9th Cir. 1991). The credibility findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

Although the Court ultimately concludes that the ALJ did not err, the Court will first consider the new arguments that Defendant raises on appeal. Of course, the Court cannot rely upon these. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("General principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ … [s]o the Commissioner's effort to pinpoint parts of the ALJ's decision that support the credibility finding is unhelpful."). In any event, they fail on their merits. First, Defendant argues that "no physician opined that Plaintiff was so limited she could not work." However, as explained above, Dr. Tepper expressed this opinion when he characterized Plaintiff as "temporarily totally disabled." Defendant's second new argument turns on Plaintiff's "work history." However, instead of discussing Plaintiff's work prior to her alleged disability, Defendant points to her history of work during the time of her alleged disability. But one should

hardly be surprised that a person applying for disability benefits has not looked for work since her alleged disability date. As Plaintiff explained, she believed her pain would prevent her from doing any work. Defendant also notes that in 2005, prior to her surgery, Plaintiff's physicians had released her to do work with restrictions, but her employer apparently did not have positions available with such restrictions. To the ALJ, this fact "suggest[ed] the possibility that if the employer had had such positions available, perhaps the claimant would not currently be claiming disability." But even if she had taken a job in 2005, she might have been unable to keep it by September 2007, when the ALJ acknowledged that her condition worsened and these doctors' opinions ceased to apply.

In addition, the ALJ gave inadequate reasons for rejecting Plaintiff's reports of daily living. Defendant concedes this. The ALJ simply stated that Plaintiff's "allegedly limited daily activities cannot be objectively verified with any degree of certainty." However, simply pointing out that daily activities cannot be corroborated is too insubstantial a reason for rejecting them, particularly where Plaintiff described substantially the same limitations on several occasions. The ALJ also pointed to "the relatively weak medical evidence and other factors discussed in this decision." This reason reads like boilerplate and lacks the necessary specificity to build a bridge between the medical evidence and Plaintiff's activities of daily living. "[T]he ALJ must *specify* the reasons for his finding so that the applicant and subsequent reviewers will have a fair sense of the weight given to the applicant's testimony." *Golembiewski*, 322 F.3d at 916.

However, in the remainder of her opinion, the ALJ did provide sufficient reasons for rejecting Plaintiff's testimony. These reasons were grounded in medical evidence, opinion evidence, credibility findings, and factors such as the location, duration, frequency, and intensity of the symptoms and measures taken to alleviate the symptoms. The Court will discuss Plaintiff's treatment in three time periods: before seeking treatment with Dr. Tepper (September 2007), before Dr. Tepper's permanent and stationary report (March 2009), and after Dr. Tepper's report.

Soon after her injury in 2005, Plaintiff was diagnosed with a strain of the lumbar spine. The MRI from May 2005 was mostly "unremarkable." The medical evidence was sufficient for the ALJ to view Plaintiff's condition as inconsistent with her symptoms during this timeframe. In addition to the medical evidence, during this time period, several medical sources opined that Plaintiff was not

15

disabled. For example, Dr. Alade believed that pain medication was not necessary except for anti-inflammatories and epidural injections. Dr. Schopler thought that Plaintiff "appear[ed] to amplify her symptoms above and beyond what her diagnostic studies indicate." Although the ALJ gave "little weight" to these sources, it is clear from context that the ALJ was not questioning the validity of these opinions at the time they were offered, but was instead questioning their continued validity, as they "were provided 2-3 years prior to surgery on her lumbar spine." Despite continued pain after "extensive" physical therapy in 2005, epidural injections, and trigger point injections, and some benefit from Vicodin, Dr. Mack felt he had "exhausted [his] diagnostic and therapeutic capabilities." The ALJ properly relied on this opinion and credibility evidence, alongside the medical record, to conclude that Plaintiff's level of pain was not credible during this time period.

The second time period begins in September 2007, when Dr. Tepper diagnosed degenerative disc disease and stenosis based on a new MRI. According to the ALJ, this MRI established a "worsening" of Plaintiff's condition. However, the medical evidence was again inconsistent with Plaintiff's symptoms: by April 2008, three months after undergoing fusion surgery, a CT scan showed satisfactory fusion at L5-S1, as well as minimal retrolisthesis at L4-S1, and facet arthropathy at those levels. Physical examination revealed no particular objective findings, aside from range of motion and other measurements taken at each examination by one of Dr. Tepper's assistants, and Plaintiff's diagnosis remained "status post 360 fusion." Although her lumbar spine demonstrated a decreased range of motion, her lower extremity muscular strength was intact and she had negative straight leg raising bilaterally. The ALJ also noted that Plaintiff's symptoms at this time were inconsistent the description she gave at the ALJ hearing. In March, April, July, and December 2008, and January 2009, Plaintiff continually reported an improvement in symptoms since the surgery. Plaintiff's physical therapist noted that she had less frequent symptoms in her lower extremities, and her range of motion in the lumbar spine was within 0 percent of normal. This continual improvement was consistent with the projections of the state agency non-examining physicians. Again, the ALJ properly relied on this opinion and credibility evidence, alongside the medical record, to conclude that Plaintiff's level of pain was not credible during this time period.

16

Finally, in March 2009, Dr. Tepper issued his permanent and stationary report. Dr. Tepper explicitly took into account Plaintiff's complaints of pain and concluded that she was "permanently partially disabled," with the ability to lift up to fifteen pounds and no repeated bending or stooping. In August 2009, Plaintiff acknowledged to Dr. Silbart that the radiating pain in her legs had considerably subsided beginning in March 2009. She could toe and heel walk and could squat one-quarter of the way down and arise from the squatting position without the use of her arms. She ambulated without an assistive device or an antalgic gait, and demonstrated negative straight leg raising tests as well as negative Lasegue and Fabere maneuvers bilaterally. She also demonstrated full muscle strength in the lower extremities, and intact sensation as well as reflexes. A lumbar x-ray showed well-incorporated fusion and well-maintained hip joints and sacroiliac joints. Her range of motion measurements averaged 19.3/90 on flexion, 10.3/25 on extension, and 9.3/25 on right and left lateral bend. By contrast, her measurements were much greater in the previous and following months: In April 2008, her pain was a "7," her flexion was 38, extension 13, right bending 16, and left bending 18. In October 2008, when her pain was an "8," flexion was 40, extension 15, right lateral bending 16, and left lateral bending 18. March 2010, despite reporting continued pain, she was doing her home strengthening and stretching exercises and showed significant improvement. Her pain level with medication was "10," and her flexion was 45, extension 25, and lateral bending 25 on both sides. Again, the ALJ properly relied on this opinion and credibility evidence, alongside the medical record, to conclude that Plaintiff's level of pain was not credible during this time period.

### D.      **The Court Remands for Reconsideration of Credibility and Medical Opinion**

"The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court has discretion to issue a so-called "sentence four" remand, or may direct an award of benefits where the record has been fully developed and where further administrative proceedings would serve no useful purpose. *Smolen*, 80 F.3d at 1292. "In the past, we have credited evidence and remanded for an award of benefits where (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3)

it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Id.; see also Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000).

Here, the failure to consider Dr. Tepper's opinion does not require immediate payment under *Smolen*. His opinion went solely to the ultimate question of disability, a question reserved to the ALJ. *See Holmes*, 2011 WL 2837698 (even if court were to credit opinion that plaintiff was "temporarily, totally disabled," remand was necessary to determine whether plaintiff was disabled for purposes of Social Security Disability Insurance Benefits). He did not describe any specific limitations. Furthermore, his opinion is worryingly brief—just a single sentence—and is repeated verbatim across several consecutive opinions. This raises the concern that the opinion was copied and pasted and may not have consistently had support in the medical record evidence. Courts retain flexibility in applying the "crediting as true" theory. *Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003). Just as the Commissioner is not bound to accept an opinion on an ultimate question, this Court will not accept Dr. Tepper's opinion until it has determined whether it has any merit or foundation in the first place. Therefore, the Court remands for the Commissioner to consider Dr. Tepper's opinion in the first instance.

## V.     Conclusion and Order

Accordingly, **IT IS HEREBY ORDERED:**

   1. Defendant's motion for summary judgment (Doc. 16) is **DENIED;**

   2. Pursuant to sentence four of 42 U.S.C. § 405(g), this matter is **REMANDED** for further proceedings consistent with this decision; and

   3. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATED:  4/26/2013**                              **/s/ SANDRA M. SNYDER**
                                                                  **UNITED STATES MAGISTRATE JUDGE**